Corash & Hollender, P.C.
Attorneys for Debtor
1200 South Avenue, Suite 201
The Corporate Park of Staten Island
Staten Island, New York 10314
Telephone: (718) 442-4424
Fax: (718) 273-4847
Paul Hollender (PH-5834)
phollender@silawfirm.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                              **Chapter 13**

      Nicholas and Stephanie Moukazis,        **Case No. 1-12-42299-jf**

               Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### APPLICATION  FOR ALLOWANCE OF ATTORNEYS FEES  FOR DEBTOR IN CHAPTER 13 CASE

The application of Corash and Hollender, P.C. respectfully represents:

### AMOUNT REQUESTED

1)  Applicant firm is counsel for the above-named Chapter 13 Debtors and makes this application for approval of attorneys fees pursuant to Section 330(a)(4)(B) of the Bankruptcy Code.  This application is made at the request of the Chapter 13 Trustee.  Counsel seeks approval of a flat fee of $7,500.00 for evaluation of the feasibility of a Chapter 13 case, preparation of the initial schedules, working with the client to formulate a plan, filing all documents, providing mandatory disclosure to the trustee, one appearance at a 341 meeting and one appearance at a confirmation hearing, along with attendant meetings with and communication with the client to effectuate the same.  Pre-petition, counsel has received $1,000.00.  We have filed a proof of claim for the balance of $6,500.00, to be paid under the plan.

**BACKGROUND**

2) Mr. Moukazis is employed as a NYC Police Officer and currently earns about $83,000.00 per year.

3) Mrs. Moukazis is employed in a managerial position for Morgan Stanley and currently earns about $52,000.00 per year.

4) Their combined 2011 income was $ 135,302.00. Based upon recent paystubs used to prepare Schedule I, their 2012 income, if it continues at the same rate, is likely to be approximately $150,000.

5) Their household also includes 2 children, ages 4 and 5, who attend public school.

6) We determined that the Debtors are above the median income. They have Current Monthly Income of $13,126.86, which, after allowable means test deductions of $13,120.80, yields Monthly Disposable Income of $6.06. Schedules I and J show a net monthly surplus of $269.83.

7) The present bankruptcy case was precipitated by overspending, followed by a home equity loan, a pension loan, and a 410k loan to pay cumulative debt, without a careful review of spending habits. The payments on the resulting loans essentially exhausted the clients' monthly cash-flow. The case was filed on March 30, 2012 . The parties' objective is to pay back their creditors to the best of their ability over a 5 year period.

8) The Debtors presently own the following Real Estate:

A) Residence owned by the Debtors valued at $433,200.00 with a first mortgage of $373,931.00 and a Home Equity Loan of $23,975.00, leaving net equity of $35,294.00 of which all is exempt, using the federal exemptions, leaving no non-exempt equity.

9)   The only Plan we have filed (Document Number 5), and which was approved by the Court on July 11, 2011 will pay priority creditors in full.

10)   Home mortgages and vehicle leases are current and will be paid outside the Plan.

11)   General unsecured creditors (scheduled at $92,754.00) will receive  approximately $41,432.20, under the Plan yielding a distribution of approximately 44 percent.  This will be accomplished by a step-up plan, starting at $200.00 monthly, and increasing as each retirement loan is paid off.  The first step-up is after 22 months, to $795.00; the second; two months later, to $1,1313.00 for 36 months.

**TIME SPENT ON FILE**

12)   Against the agreed flat-fee of $7,500.00, and between the date of retention of February 6, 2012, and the confirmation hearing held July 11, 2012, the firm has expended a total of 35.80 hours for professional services rendered on behalf of the Debtor with a dollar value of $8,382.50.  Annexed as **Exhibit A** is the time detail.  The time can be summarized as follows:

| Name | Time-keeper # | Position | Hourly Rate | Total Hours | $ Amount |
|---|---|---|---|---|---|
| Paul Hollender | 2 | Partner | $350.00 | 12.10 | $4,235.00 |
| Brian Palma | 27 | Paralegal | $175.00 | 21.80 | $4,060.00 |
| Roberta Balber | 34 | Paralegal | $175.00 | 0.50 | $87.50 |
|  |  |  |  |  |  |
| *TOTALS* |  |  |  | 35.80 | **$8,382.50** |

| Blended Hourly Rate: | | |
|---|---|---|
|  | Total amount Billed: | $8,382.50 |
|  | Divided by total hours billed: | 35.80 |
|  | Equals Blended Rate: | $234.14 |

## GENERAL SUPPORTING INFORMATION

13)   The flat fee charged in this case is one which we believe is reasonable in the marketplace for the services we have provided, and is the minimum we must charge to meet our overhead expenses.  The supporting time entries are based upon hourly rates for Bankruptcy partners of $350; for Associates of $300; and for paralegals of $175.  These are the same rates as those which are currently being charged all the firm's clients for consumer bankruptcy and non-bankruptcy matters, and are comparable with rates being charged in this geographic locality for attorneys of comparable experience, for the types of services rendered to the Debtors herein.  For business bankruptcy matters, I currently charge $450/hr., however I have refrained from increasing my rates for consumer work.  The hourly rates charged are believed to be in the middle of the range charged by other bankruptcy attorneys in the New York area.

14)   Had we chosen to bill this matter on an hourly rate, rather than a flat fee of $7,500.00, the time expended would have supported a bill of $ 8,382.50, not including the time spent on preparing the within application, which has amounted to an additional $3,202.50. (**Exhibit B**).  Had this been a Chapter 11 case, the time for preparation of a fee application would have been billable time, thus, when added to the substantive time devoted to this matter, the total time billed against the flat fee now amounts to $11,585.00.

## FACTORS TO BE CONSIDERED

15)   Various factors have been suggested by the Courts for consideration in awarding compensation in a bankruptcy case.  Consideration of these factors follows:

16)   <u>Nature and Extent of Services</u>:  Chapter 13 work is particularly challenging.  Clients whose financial difficulties have accrued over the years, have a tendency to expect that just because they have hired a bankruptcy lawyer, their lives will be automatically easier.  Actually,

it is often the opposite.  Difficult decisions must be made, and this cannot be accomplished without substantial groundwork by the Chapter 13 attorney and his staff.   The attorney must also be careful to assist the client and develop a Plan consistent with objective reality, rather than based upon subjective emotions.  This is not easy work and often takes quite some time to evolve.

17)    <u>Time and Labor Required</u>:  As indicated above, although we quoted and are willing to accept the flat fee of $7,500.00, the time spent on the case, actually amounted to $8,382.50.  This was comprised of approximately 12 hours of attorney time and 24 hours of paralegal time.  We also must point out that it is impossible to "capture" all time spent on a file, because there are many times that we handle a file to ask or answer a question, or to deal with mail, that never gets entered.

18)    <u>Novelty and Difficulty of Issues</u>: When this case was undertaken, the client insisted that he could not make payments under a Chapter 13 Plan because he had no free funds after paying fixed expenses. We recognized, however, that such a high-income household would not qualify for a Chapter 7 case, thus we worked with the clients to tighten their budget to make an initial monthly installment possible.  Then we found "hidden" money by committing to the plan payments which are presently allocated to a pension loan and a 401k loan, to be paid to the Trustee when the loans have been completed.

19)    <u>Preclusion from Other Employment</u>:  One of the difficulties with Chapter 13 work, perhaps not always recognized by Judges and Trustees, is that clients come to us seeking substantial legal services in a relatively short time period, often on an emergency basis, yet these clients are usually without funds to pre-pay for these services.  This, in effect, forces attorneys who practice in this area to fund the clients' legal services for a substantial period.  The hard

alternative is that absent quality attorneys who are willing to provide legal services on credit, Chapter 13 Trustees and Judges would be forced to deal with pro-se Debtors: clearly not an easy or efficient task in the complex world of Chapter 13.  For each Chapter 13 case undertaken, the bankruptcy practitioner is sacrificing cash-flow in exchange for the sometimes ephemeral expectations that the attorney can solve the client's problem, that a Plan can be confirmed, and that the client will consummate the plan.

20)    <u>Whether the Fee is Fixed or Contingent</u>:  In a Chapter 13 fee, absent full payment before filing (an oddity), the attorney is always working on a contingency basis: if he cannot propose a feasible plan, or if the client has life events which prevent payment under the plan, the attorney will not be paid.  From an objective point of view, **<u>every Chapter 13 case is a big risk for an attorney</u>**.  Prior to being retained, the client has been unable to pay all their expenses. The attorney must, at his own risk and expense, analyze the objective facts, and the client's subjective determination and integrity, while simultaneously performing services for which, absent successful plan confirmation and performance, he may never be compensated.

21)    <u>Time Limitations</u>: Chapter 13 cases impose special time limitations due to the need to collect documents prior to filing and the constantly-changing means-test period, impacting plan calculations.  Then we must provide information to the Trustee prior to the 341 meeting and additional information prior to confirmation.

Documents must be collected, analyzed to create a feasible Plan before filing, with the numbers changing on a monthly basis: thus the attorney is always dealing with a moving target.

When we are trying to file a case prior to a foreclosure sale or to stop an income execution, we are often forced to work on an expedited basis.

Because each Trustee has his/her unique plan requirements, Debtor's counsel and staff must prepare from the outset two different Plans, since we do not know which Trustee will be assigned to the case.

Likewise, since one Trustee requires tax transcripts for partial payment plans, and we do not know which Trustee will be selected, we must do this work for all cases, even if not ultimately required.

Since the taxing authorities (NYS in particular) do not timely supply the transcripts, we are forced to spend time following up to try to get responses.

Chapter 13 clients tend to have had prior difficulties dealing with financial details.  As their attorneys we must coax out of them all the details that are essential for a successful Chapter 13 case.  This is often quite a challenge. This is complicated by the fact that we must obtain updated information each month until the case is filed.

Dealing with utility bills in a Chapter 13 case is also a time-consuming process. One Trustee requires all pre-petition utility bills to be paid in full before filing, or we must list the utility as a creditor. Since we do not know which Trustee will be assigned, we must deal with this issue for each utility company (gas, electric, water, cable tv, cell phone, house phone). Moreover, since facts change each month, and we are never certain which month the case will be filed in, this is an on-going issue.

The other Trustee requires proof of payment of post-petition utility bills, thus we must deal with these issues on an ongoing basis until confirmation.

Plan-calculation is often a time-consuming matter, particularly when dealing with partial plans, and step-up plans involving expiration of pension/401k loans and car loans.

Right after the case is filed, meaningful supporting documentation must be provided to the Trustee in preparation for the 341 meeting. Despite our best efforts, most cases require additional documents to be provided to the Trustee after the 341 meeting.

The Trustee's staff will then provide an analysis which may differ from that which Debtor's counsel has assembled. It often is a time-consuming process to account for differences between a client's income (based upon pay stubs, tax returns and other material we collect before filing) and the deposits into their bank accounts which Trustees often analyze.

Also, since Trustee's staff is often overburdened in performing their duties for upcoming calendars, it is sometimes difficult to address issues prior to the week before a confirmation hearing. This creates additional time pressures for Debtor's attorney and staff, and often may lead to the need to adjourn the confirmation hearing.

In the event we must amend the Means Test or Schedules I and J, then the Plan must be amended. If the amendment negatively affects creditors they must be served. This may, in turn result in adjournment of the confirmation hearing.

To properly prepare for confirmation we must regularly review the claims register and compare the filed claims against the scheduled amounts, to assure that the Plan provides sufficient funds to be feasible.

Another time-consuming issue is the need to obtain the facts necessary to prepare an affidavit of post-petition payments to secured creditors and lessors. Many of these representatives fail to recognize bankruptcy court requirements, and often cannot locate previously-provided authorizations. This creates unnecessary delays and additional work on the part of our staff.

It is also difficult to get secured creditors and student loan creditors to timely file necessary proofs of claim, or to withdraw claims for items to be paid outside of the Plan.

Because the confirmation hearing precedes the bar date, it is often necessary for Debtor's counsel to first correspond with and call certain creditors multiple times to request that they file claims. Ultimately, at the Trustee's request, we often must file claims for such recalcitrant creditors. Thereafter, if the creditors actually file claims, we must take the time to withdraw claims we have filed on their behalf, and make sure the clerk's office and trustee's staff are dealing with the proper claim.

Then, after correct amounts are determined by actual claims, we must amend our plans to conform with these numbers.

Finally, the nature of Chapter 13 work requires us to regularly check to make sure that the clients are current on their plan payments.

Our clients are undergoing a major change in their lives by reason of the chapter 13 filing, and our staff in on the front-line helping them adapt to what sometimes is a major culture shock. This is a time-consuming and often frustrating process for all involved, and out staff works conscientiously to assure that rules and requirements are complied with.

22)    <u>Amount Involved</u>: The Debtors have $93,000.00 in unsecured debt. The Plan will pay about 44% to these creditors.

23)    <u>Results Obtained</u>: Rather than pursuing the unrealistic goal of obtaining a Chapter 7 discharge, we worked with the client to structure a step-up plan which will pay almost half of their unsecured debt over the next five years. The Moukazis family will be using their best efforts to pay their debts, starting with only $200 per month, but eventually reaching $1,313

per month after two years.  They have adjusted their spending and can live within this budget.

The children are attending public school, and the family has a reasonable going-forward budget.

The client has expressed his sincere appreciation for our efforts at straightening out his family's

finances.

24)  <u>Value of Services</u>:  On a time basis, the work in this case has generated hourly

charges of $8,382.50 for which we have agreed to accept a total fee of $7,500.00 .  On a different

level, the ability of our firm to obtain confirmation of a Plan means that Mr. and Mrs. Moukazis

are now able to sleep at night.  They have a fixed plan for the next five years to pay their old

debt.  They can retain their home.  At the end of five years they will no longer have any 401k or

pension loan, and no more chapter 13 plan payments.  They should then have an additional

$1,300.00 per month of disposable income to deal with their childrens' future educational needs..

25)  <u>Interests of Creditors</u>:  Creditors will receive about 44% recovery on their debt.

Absent this plan, they would have been relegated to income executions, one at a time and in

series over many years.  Now, they will automatically be receiving *pro-rata* distributions on a

regular basis.

26)  <u>Experience, Reputation and Ability of Counsel</u>:  Paul Hollender has practiced

Bankruptcy Law for since 1977.

**General Bankruptcy Credentials:**
Martindale-Hubbell rated AV Preeminent
Board of Directors, American Board of Certification (2006 - date)
Board of Governors, Bankruptcy Lawyers Bar Association (1982 - 91)
Bankruptcy Bar Bulletin, Editorial Board (1982 -91; Editor in Chief 1989 - 91)
Member, American Bankruptcy Institute
Published articles NYS Bar Journal,  NY Law Journal
Bankruptcy Court Mediation panels (EDNY, SDNY)

**Consumer Bankruptcy Credentials:**
> Board-Certified, Consumer Bankruptcy (1993) (American Board of Certification)
> Member, National Association of Consumer Bankruptcy Attorneys
> Peer-rated for inclusion in NY SuperLawyers, Metro Edition (2007-date) (one of 6
> Consumer Bankruptcy Attorneys)

**Business Bankruptcy Credentials:**
> Board-Certified, Business Bankruptcy  (1993) (American Board of Certification)
> Representation of numerous individuals and businesses in EDNY and SDNY as
> Chapter 11 debtors, creditors and defendants.

27)  <u>Undesirability of the Case</u>:  Most consumer bankruptcy attorneys avoid handling

Chapter 13 cases.  Unlike Chapter 7 cases, they are very time-consuming in terms of collecting

data, providing initial information to the Trustees, providing follow-up documentation requested

by Trustees, modifying  plans to meet Trustees' requirements and ultimately obtaining

confirmation.  Then we are met with substantial additional issues, including lift-stay motions,

motions to dismiss, monitoring client payments, dealing with secured creditors who claim not to

have received payments, dealing with secured and priority creditors who fail to file claims, or

fail provide post-petition billing statements to clients or allow on-line account access, interaction

with lenders with whom clients have initiated requests for mortgage modifications, issues

relating to household income and changes of income, tax refunds, post-confirmation loan/lease

issues, and many, many other matters.  Chapter 13 cases "are never finished" and require our

active involvement for the life of the Plan.  We undertake such cases because clients come to us

in dire straits, seeking to save their homes or regain control of their finances.  It is very

gratifying to accomplish this for people, but obtaining such results is not easy.  Furthermore, it is

quite challenging to discern those matters in which Chapter 13 is a realistic solution, from those

in which a household's change in composition or income simply prevents them from maintaining

a former lifestyle.  Thus, in addition to the obvious financial issues, dealing with clients who

desire to file a Chapter 13 case often involves skill in assisting clients with emotional issues as

well.

      28)   <u>Professional Relationship with Client</u>: The hallmark of our office is to be very

mindful of the fragile emotional state of every client when they first come to meet a bankruptcy

attorney.  We consider our job not merely to "get an automatic stay", but rather to provide

emotional support, re-focus our clients' energies, and to help them develop strategies for

extricating themselves from their present financial difficulties and starting them on a path to

financial recovery.  This process is professionally rewarding and is the essence of the function

we perform.  In the present case, the clients were very appreciative that we were willing to

accept only $1,000.00 before the case was filed, with the balance to be paid under the Plan.  The

clients were very happy that we were able to convince the Court to approve this Plan, with an

initial monthly payment of only $200.00, to be increased as each retirement loan was paid off.

After the confirmation hearing, Mr. Moukazis made a special effort to telephone my paralegal,

Brian Palma, to express his thanks and appreciation.

      29)   <u>Awards in Similar Cases</u>: It is my understanding that the fees I charge sometimes

tend to be higher than average.  This is something that I explain to my clients at the very first

meeting.  It is the consequence of our being thorough, careful, and conscientious: qualities that

maximize our success rate.

        Rather than shying away from the fact that we charge at the high end, we are proud of

our work, which generally yields excellent results for clients, enables Trustees to work

efficiently, minimizes court appearances and time-burdens on Trustees and Judges, and enhances the reputation of this Court for stabilizing the lives of our clients.

The fact that we tend to receive substantial referral business from satisfied clients and various professionals is a testament to the fact that the thoroughness of our work produces desired results.  These cannot be obtained without the investment of time and effort; and that cannot be provided by offering "cut-rate fees".  Both myself and my highly trained and caring staff are always available to answer client questions; to encourage them to seek out sometimes difficult-to-find information which we consider essential to properly analyze risks and prepare their case; to complete schedules and plan preparation; and to provide disclosure to the Trustees. Compensating for the higher fees which this extensive work requires, is the fact that we often allow the bulk of our fees to be paid under the Plan.

30)    <u>Office Overhead</u>:  In making its award, the Court is requested to keep in mind that the applicant firm maintains a 5,000 square-foot office in a modern corporate park.  The firm's work is approximately half bankruptcy and half non-bankruptcy.  The firm is comprised of two partners and two associate attorneys.  Our staff includes three bankruptcy paralegals; one secretary/bankruptcy paralegal; two non-bankruptcy secretaries; an office manager who handles all preliminary contact with potential clients, scheduling and billing; an accounts-receivable manager; a bookkeeper; and a receptionist, all of whom must be paid weekly.  We maintain an up-to-date computer network, and must pay all customary costs of running a modern fully-equipped law office.  We have extensive advertising costs; dues and CLE costs for attending nationwide bankruptcy programs to maintain certification and skills; professional liability and other insurance costs; hardware, software and technology costs; telecommunication costs;

-13-

Lexis-Nexis contracts; equipment leases; rent and utilities.  Because we are not a "bankruptcy mill" but rather strive to practice high-quality bankruptcy law in a professional environment with all necessary "tools", our firm's existence requires these extensive overhead costs.  To enable us to continue to provide such quality services for the benefit of our clients, the Chapter 13 Trustees and the Court, it is essential that we continue to charge sufficient fees to meet these operating expenses.

## CONCLUSION

31)  Each member of our bankruptcy staff takes personal pride in the role they play in stabilizing clients' lives, in the quality of their work, and in providing compassionate and personal service to our clientele.  The fees we charge are essential to performing these services. I believe it is important to note that prior to accepting a new Chapter 13 case, I perform a thorough and time-consuming evaluation of the feasibility of confirming a plan.  At the first client meeting, which often takes one and one-half to two hours, (and for which I do not take a fee unless retained), I review the potential client's current financial condition and the underlying causes of their problems.  I work up a projected plan and I perform a candid evaluation of the likelihood of the client being able to succeed with this plan.  I provide the potential client with various bankruptcy and non-bankruptcy options.  Only after this exhaustive analysis am I willing to offer a retainer agreement.  Sometimes I have two or three follow-up visits before being retained.  When I am retained, it is usually with a relatively modest initial deposit to get started, with an additional modest payment prior to filing.  I usually agree to accept most of our fee under the Plan, to be received substantially after we have performed our work.  Thus, my firm, in

-14-

effect, is financing these Chapter 13 cases, for people who otherwise would be unable to hire an attorney to save their house, or use Chapter 13 to solve their overwhelming financial difficulties.

32)  When I have completed my preliminary analysis, my highly skilled and thorough staff goes through the same process again, this time reviewing actual income and expense data and obtaining accurate figures as to potential claim amounts, performing a pre-trustee and pre-judge "reality check" on my desire to help this new client.   Rather than merely accepting any client that "comes through the door", I will not file a Chapter 13 case unless I am convinced that the client has a strong likelihood of success.  In this painstaking fashion, my office is performing a "vetting" process in weeding out cases that would otherwise cause a waste of time for the Trustees and the Court, while at the same time nurturing and assisting those clients who have a realistic ability to confirm and consummate a Chapter 13 Plan.   This is a function not served by all attorneys who practice before this Court, and it is submitted that the Court should be encouraging the continuation of such high levels of service to clients, Trustees and the Court.

33)  Providing support to the various attorneys who meet these high standards will reduce the likelihood that debtors-in-need will fall prey to those attorneys who demand high initial deposits from people in dire straits, solely to obtain an "automatic stay" and then fail to follow through with their obligations, resulting in successful "lift-stay" motions and case dismissals without professional accountability.

**WHEREFORE**, Applicant firm requests an Order (I) approving attorneys fees for Debtor's Counsel in the amount of $7,500.00 and authorizing the Trustee to pay the administrative claim filed by the firm for $6,500.00.

Dated:  Staten Island, New York
         August 8, 2012

CORASH & HOLLENDER, P.C.
Attorneys for the Debtor

By:  _____/s/_____
       Paul Hollender (PH-5834)
